**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-1943**

———————

WILLIAM T. LYONS, Individually and on Behalf of Others Similarly Situated,

Plaintiff - Appellant,

v.

PNC BANK, N.A.,

Defendant - Appellee.

----------------------------------

CONSUMER FINANCIAL PROTECTION BUREAU,

Amicus Curiae.

AMERICAN BANKERS ASSOCIATION,

Amicus Supporting Appellee.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge.  (1:20-cv-02234-SAG)

———————

Argued:  May 8, 2024                                                   Decided:  August 14, 2024

———————

Before GREGORY and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————

Reversed and remanded in part and affirmed in part by published opinion.  Judge Gregory wrote the opinion, in which Judge Quattlebaum joined.  Senior Judge Floyd wrote a dissenting opinion.

---

**ARGUED:**  Scott C. Borison, BORISON FIRM LLC, San Mateo, California; Phillip R. Robinson, CONSUMER LAW CENTER LLC, Silver Spring, Maryland, for Appellant. Fredrick S. Levin, ORRICK, HERRINGTON & SUTCLIFFE, LLP, Santa Monica, California, for Appellee.  Stephanie Garlock, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Consumer Financial Protection Bureau.  **ON BRIEF:**  Brian W. Bartholomay, Sarah B. Meehan, BUCKLEY LLP, Washington, D.C.; Daniel J. Tobin, BALLARD SPAHR LLP, Washington, D.C., for Appellee.  Seth Frotman, General Counsel, Steven Y. Bressler, Deputy General Counsel, Kristin Bateman, Acting Assistant General Counsel, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Consumer Financial Protection Bureau.  Thomas Pinder, Andrew Doersam, AMERICAN BANKERS ASSOCIATION, Washington, D.C.; Robert A. Long, Mark W. Mosier, Emile J. Katz, COVINGTON & BURLING LLP, Washington, D.C., for Amicus American Bankers Association.

---

2

GREGORY, Circuit Judge:

This appeal is about whether certain provisions of two consumer protection statutes, the Truth in Lending Act (TILA) and the Real Estate Settlement Practices Act (RESPA), cover Home Equity Lines of Credit (HELOCs).  We hold that TILA's offset provision, which prevents creditors from dipping into consumers' deposit accounts in order to offset outstanding payments on their credit card plans, applies to HELOCs.  We also hold that the Consumer Financial Protection Bureau (CFPB) has the authority to exempt HELOCs from RESPA's definition of "federally related mortgage loans."  Because the CFPB has done so, RESPA's requirement that debt collectors timely and adequately respond to consumers notifying them of errors in mortgage servicing does not apply to HELOCs.

I.

In 2005, Plaintiff-Appellant William Lyons opened a HELOC account[1] with National City Bank.  J.A. 199.  The bank issued Lyons a credit card that he could use to "obtain cash advances or to make purchases using HELOC loan funds."  *Id.*  Four years later, PNC Bank acquired National City Bank and took over Lyons' HELOC loan.  *Id.*

---

[1] A Home Equity Line of Credit is a loan that allows the consumer to borrow money, using their home as collateral.  A consumer can usually borrow up to a specified percentage of their home equity.  HELOCs consist of a "draw period" and a "repayment period. During the draw period, the consumer can draw money and must also make repayments (sometimes only payments of interest).  During the repayment period, which usually lasts ten to fifteen years, the consumer can no longer draw money and must pay back the entire loan.  *See* Consumer Financial Protection Bureau, *What You Should Know About Home Equity Lines of Credit*, https://perma.cc/8WWR-UQE7 (last accessed June 17, 2024).

After that, Lyons opened three deposit accounts with PNC. J.A. 200; *Lyons v. PNC Bank, Nat'l Assoc.*, 26 F.4th 180, 183 (4th Cir. 2022). In September 2019, PNC withdrew roughly $1,400 from Lyons' deposit account to offset an outstanding payment on his HELOC loan. J.A. 200. PNC did not notify Lyons before doing this. Lyons wrote to PNC and told them that they had no right to make the unauthorized transfer. *Id.* In January 2020, PNC responded, suggesting that it was authorized to make the withdrawals and declining to provide additional documentation to Lyons. *Id.* The following month, February 2020, PNC made another withdrawal, this time for almost $1,600, to offset an outstanding payment on Lyons' HELOC account. *Id.*

Lyons sued in state court for "economic damages in the form of interest he would have earned" from two of his deposit accounts had PNC not withdrawn money from them, statutory damages under the Truth in Lending Act and the Real Estate Settlement Practices Act, and damages "resulting from annoyance, frustration, anger, and fear." *Id.*; *Lyons*, 26 F.4th at 184. PNC removed the suit to federal court, filed a verified answer to the complaint and a motion to compel arbitration on the TILA claim. J.A. 201. The district court granted in part and denied in part the motion to compel arbitration, holding that PNC could compel arbitration as to one deposit account but not the other. *Id.* Both parties appealed to this Court. J.A. 201–02.

We held that the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376, which amended TILA, "prohibits consumer agreements related to residential mortgage loans from requiring the arbitration of claims." *Lyons*, 26 F.4th at 183. Because the case came to us on interlocutory appeal, we considered only the arbitration issue. We remanded to the

4

district court, where PNC moved for judgment on the pleadings. The district court ruled in favor of PNC on both claims. First, it held that TILA's offset provision does not apply to HELOCs. J.A. 203–04. PNC was therefore not prohibited from offsetting Lyons' outstanding HELOC payments by withdrawing money from his deposit accounts. *Id.* Second, the district court held that the relevant RESPA disclosure and notice requirement did not apply to HELOCs because the CFPB had authority to implement a rule that exempts HELOCs from that provision. J.A. 204–06.

Lyons appeals, arguing for reversal on both counts. The CFPB and the American Bankers Association submitted amicus briefs. The CFPB argues for reversal on the district court's TILA holding and affirmance on the district court's RESPA holding. The ABA urges affirmance in whole.

## II.

We have jurisdiction over the district court's grant of the motion for judgment on the pleadings. 18 U.S.C. § 1291. We review that decision under the same standard as we review a motion to dismiss, *i.e.* de novo. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (only practical difference between a Rule 12(b) motion and a Rule 12(c) motion is whether the motion is filed before or after an answer to the complaint is filed). We review questions of statutory interpretation de novo. *Bakery & Confectionary Union & Ind. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 701 (4th Cir. 2018).

5

III.

A. Statutory Background of TILA

The Truth in Lending Act was enacted in 1968 to promote "the informed use of credit." Pub. L. No. 90-321, 82 Stat. 146 (1968). It required creditors to provide certain disclosures and to issue periodic statements to debtors. It also imposed civil liability on those who didn't comply with those provisions. It set out rules about credit advertising, regulated "Extortionate Credit Transactions," and restricted garnishment.

In 1974, six years after the first iteration of TILA was passed, Congress amended TILA via the Fair Credit Billing Act, which created more protections against "inaccurate and unfair credit billing and credit card practices." Pub. L. No. 93-495, 88 Stat. 1500 (1974) (codified as amended at 15 U.S.C. § 1666–1666j). Those additions included provisions about disclosing fair credit billing rights and the correction of billing errors, among other things. Relevant here is the bill's offset provision, which says:

> (a) A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer unless—
>
> > (1) such action was previously authorized in writing by the cardholder in accordance with a credit plan whereby the cardholder agrees periodically to pay debts incurred in his open end credit account by permitting the card issuer periodically to deduct all or a portion of such debt from the cardholder's deposit account, and
> >
> > (2) such action with respect to any outstanding disputed amount not be taken by the card issuer upon request of the creditor.

Pub. L. No. 93-495, § 208 (codified at 15 U.S.C. § 1666h(a)). The Federal Reserve Board of Governors, which had authority to implement TILA before the CFPB was created,

6

amended TILA regulations (collectively referred to as Regulation Z) to account for the changes from the Fair Credit Billing Act. 40 Fed. Reg. 43200, 43209 (Sep. 19, 1975). The regulation that implements the statute's offset provision says in relevant part:

> A card issuer may not take any action, either before or after termination of credit card privileges, to offset a cardholder's indebtedness arising from a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer.

12 C.F.R. § 1026.12(d)(1).[2]

In January 2009, unrelated to any new legislation, but following a "comprehensive review of TILA's rules for open-end (revolving) credit that is not home-secured," the Board issued a final rule. 74 Fed. Reg. 5244. It defined "open-end credit" as:

> (20) [C]onsumer credit extended by a creditor under a plan in which:
>
> > (1) The creditor reasonably contemplates repeated transactions,
> >
> > (2) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and
> >
> > (3) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.

74 Fed. Reg. at 5399.

In 2009, Congress amended TILA again, this time through the Credit Card Accountability Responsibility and Disclosure Act (CARD Act), Pub. L. No. 111-24, 123 Stat. 1734 (May 22, 2009). That Act dealt with "open end consumer credit plan[s]." *Id.*

---

[2] The CFPB repromulgated that provision verbatim when the Dodd-Frank Act transferred implementing authority to the CFPB. *See* Regulation Z, 76 Fed. Reg. 79768, 79791 (Dec. 22, 2011).

It included provisions requiring more notice, creating limits on interest rates, fees, and finance charges, and prohibiting certain penalties, among other things.

The CARD Act's implementing regulations came in 2010 and 2011. *See* 75 Fed. Reg. 7658 (Feb. 22, 2010); 76 Fed. Reg. 79768 (Dec. 22, 2011). Relevant here, the 2011 regulations added a new term in the Definitions and Rules of Construction section. Immediately after the definition of "credit card," the regulation included this definition:

> (15) (ii) *Credit card account under an open-end (not home-secured) consumer credit plan* means any open-end credit account that is accessed by a credit card, except:
>
> (A) A home-equity plan subject to the requirements of § 1026.40 that is accessed by a credit card.

76 Fed. Reg. at 79774. By using that term repeatedly throughout the Rule, the Board exempted HELOCs from many of the CARD Act's provisions.

### B. Whether the Offset Provision Applies to HELOCs[3]

As quoted above, TILA's prohibition on offsets provides, "A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant *credit card plan* against funds of the cardholder held

---

[3] As an initial matter, Lyons argues that PNC is barred from litigating the merits of his TILA claim now because it didn't pursue the merits in the previous appeal. But that appeal concerned only whether PNC could compel Lyons to arbitrate the TILA claims—the district court did not reach the merits of the TILA claims. *Lyons v. PNC Bank, N.A.*, 2021 WL 50918, at *7 (D. Md. Jan. 6, 2021). Instead, it held that one TILA claim had to be arbitrated, and that the other TILA claim, which didn't have to be arbitrated, could proceed to class certification briefing. *Id.* PNC did not waive an issue by failing to appeal it when the district court had not yet reached it. *Cf. United States v. Stanley*, 483 U.S. 669, 676–77 (1987).

8

on deposit with the card issuer," except in certain circumstances not relevant here. 15 U.S.C. § 1666h(a) (emphasis added).

The dispute here is about what "credit card plan" means. The term is not defined in the statute or regulations. Lyons and the CFPB argue that it includes HELOCs when a consumer has been issued a card. PNC and amicus American Bankers Association argue that it categorically excludes HELOCs. To our knowledge, no courts of appeal have encountered this issue before, and the only district court to have encountered it is the district court below.

In deciding whether "credit card plan" includes HELOCs, the district court seemed to make two erroneous assumptions. First, it assumed that the definition of "credit card" in the statute bore no relevance to the meaning of "credit card plan" in the statute. J.A. 203. Second, it assumed that the term "credit card plan" meant the same thing as "credit card account under an open-end (not home-secured) consumer credit plan." *Id.* We take each of these issues in turn.

i.

The first issue deals with the statutory language only. Lyons says that the statute's definition of "credit card" includes a HELOC loan. A "credit card" is "any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor, or services on credit." 15 U.S.C. § 1602(*l*). Though "credit card plan" is not defined in TILA, Lyons argues that the phrase "simply describes general terms of the agreement governing the credit card and nothing more." Opening Br. at 24. He says that the district court erred because it "limited [the statutorily defined term 'credit card'] by holding that

9

the addition of the word 'plan' somehow was intended to remove HELOC mortgage loans from the scope of" the statute. *Id.* at 25.

We agree that the district court erred, but not in the way that Lyons thinks. The district court never held that a HELOC loan is a "credit card." So when it held that a HELOC loan is not a "credit card plan," it did not "limit[]" the meaning of "credit card"— there was nothing *to* limit. Instead, it erred by failing to recognize the relationship between "credit card" and "credit card plan." It said:

> Lyons tries to argue that his HELOC is, in fact, a credit card. While TILA defines "credit card" as "any card, plate, coupon book, or other credit device existing for the purpose of obtaining money. . . on credit," the relevant issue is the definition of "credit card plan," not just "credit card." The parties concur that National City issued a credit card to allow Lyons to access his HELOC. But his loan was a HELOC, or a home equity plan, not a credit card plan, and Regulation Z clearly provides that those two types of accounts are distinct.

J.A. 203–04. By misinterpreting Regulation Z (addressed below), the district court missed the possibility that a credit card plan is simply a plan in which a consumer accesses credit using a credit card. The type of credit (secured, unsecured, home-secured, or secured by something other than a home) is not what matters. What matters is that a card is used to access the credit and that terms and conditions govern the credit.

ii.

The district court's second error was that it assumed that "credit card plan" in the statute (15 U.S.C. § 1666h(a)) was the same thing as "credit card account under an open-end (not home-secured) consumer credit plan" in Regulation Z (12 C.F.R. § 1026.2(a)(15)(ii)). After quoting the relevant statutory language, it said:

10

> Regulation Z reiterates the necessary involvement of a "credit card plan" in the prohibited conduct . . . It expressly defines "credit card account under an open-end (not home-secured) consumer credit plan" to <u>exclude</u> "a home-equity plan . . . that is accessed by a credit card.

J.A. 203.

Whether the term "credit card account under an open-end (not home-secured) consumer credit plan" includes HELOCs only matters if you assume that the term is interchangeable with the term "credit card plan." But "differences in language . . . convey differences in meaning." *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (quotation omitted). And if the Federal Reserve Board and CFPB intended for "credit card plan" in the offset provision to cover only (1) open-end, (2) non-home secured credit plans, it could easily have used the more specific term of "credit card account under an open-end (not home-secured) consumer credit plan." It did not do so.

TILA's historical record and its implementing regulations, explained above, provide more insight into whether "credit card plan" in the offset provision is limited to open-end, not home-secured plans. Unsurprisingly, the CFPB and PNC Bank have different glosses on the historical record.

The CFPB correctly notes that, while the term "credit card plan" in Regulation Z "dates to the introduction of TILA's offset provision in the 1970s, ['credit card account under an open-end (not home-secured) consumer credit plan'] was only added a decade ago to implement" the CARD Act. CFPB Amici Br. at 16–17. That Act, which amended TILA, included several new requirements for "credit card account[s] under . . . open-end consumer credit plan[s]." 123 Stat. 1734. The statute's language (open-end consumer

11

credit plan) would, in theory, apply to HELOCs. That's because in January 2009, the Federal Reserve Board had promulgated a regulation that defined "open-end consumer credit plan[s]" in a way that *included* HELOCs. 74 Fed. Reg. 5244, 5258 (Jan. 29, 2009) (laying out three criteria for what constitutes open-end consumer credit plan). But in implementing the CARD Act regulations, the Board had to decide whether the CARD Act was actually intended to apply to HELOCs. *See* 75 Fed. Reg. at 7658 (Feb. 22, 2010). The Board decided that it was not. *See* 75 Fed. Reg. 7658, 7663–7664 (Feb. 22, 2010).[4] In order to effectuate that decision, the Board had to figure out a way to distinguish between "open-end consumer credit plan[s]" and "open-end consumer credit plan[s]" that *excluded* HELOCs. It did that by creating a new definition: "open-end (not home-secured) consumer credit plans."

Recognizing that creating this new term might cause confusion, the Board did two things. First, it said that the revisions were "not intended to alter the scope or coverage of provisions of Regulation Z *that refer generally to credit cards* or open-end credit rather than the new defined term 'credit card account under an open-end (not home-secured) consumer credit plan.'" *Id.* at 7665 (emphasis added).

Second, the Board acknowledged that "additional clarification may be helpful as to which provisions of the Credit Card Act as implemented in Regulation Z are applicable to which types of open-end credit products." *Id.* at 7663. When it was unclear whether the

---

[4] Specifically, the Board said that it excluded HELOCs because "alternative forms of regulation exist that are better suited to protecting consumers from harm with respect to th[at] product[]." 75 Fed. Reg. at 7664.

new CARD Act regulations affected a provision, the Board flagged that provision and clarified its scope. It did this by including a table. As seen below, the table doesn't mention anything about the scope of the offset provision (which is now at § 1026.12(d) but at the time was at § 226.12(d)). That strongly suggests that the Board did not believe that the CARD Act implementing regulations had any effect on the scope of the offset provision. That is, whatever the scope of the offset provision was before the CARD Act regulations, the scope remained the same after the CARD Act regulations. And because the term "open-end (not home-secured) consumer credit plans" was introduced for the first time in the CARD Act regulations, the offset provision could not have been limited to those sorts of plans *prior to* the CARD Act regulations being implemented.

| Provision | Applicability |
| --- | --- |
| § 226.5(a)(2)(iii) | All open-end (not home-secured) consumer credit plans. |
| § 226.5(b)(2)(ii)(A) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.5(b)(2)(ii)(B) | All open-end consumer credit plans. |
| § 226.7(b)(11) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.7(b)(12) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.7(b)(14) | All open-end (not home-secured) consumer credit plans. |
| § 226.9(c)(2) | All open-end (not home-secured) consumer credit plans. |
| § 226.9(e) | Credit or charge card accounts subject to § 226.5a. |
| § 226.9(g) | All open-end (not home-secured) consumer credit plans. |
| § 226.9(h) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.10(b)(2)(ii) | All open-end consumer credit plans. |
| § 226.10(b)(3) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.10(d) | All open-end consumer credit plans. |
| § 226.10(e) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.10(f) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.11(c) | Credit card accounts under an open-end (not home-secured) consumer credit plan. |

13

| | |
|---|---|
| § 226.16(f) | All open-end consumer credit plans. |
| § 226.16(h) | All open-end (not home-secured) consumer credit plans. |
| § 226.51 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.52 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.53 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.54 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.55 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.56 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |
| § 226.57 | Credit card accounts under an open-end (not home-secured) consumer credit plan, except that § 226.57(c) applies to all open-end consumer credit plans. |
| § 226.58 | Credit card accounts under an open-end (not home-secured) consumer credit plan. |

There's a final tell that makes clear that "credit card plan" does not exclude HELOCs. The new term that the Board introduced in the CARD Act regulations—"credit card account under an open-end (not home-secured) consumer credit plan"—gives it away. The parenthetical, "(not home-secured)," is only necessary if there are credit card accounts under open-end *home-secured* consumer credit plans. If those accounts did not exist, the Board would not have needed to specify. But it did, which means credit card accounts *include* accounts based on home-secured credit, unless otherwise specified.

PNC points to other parts of the history and text of the regulations. While PNC agrees with Lyons and the CFPB that HELOCs are "open end consumer credit plans," it says that HELOCs are not credit *card* plans. Oral Arg. at 2:36:38–45. It notes that "over the course of decades, Congress, the [Federal Reserve Board], and the CFPB have all taken

14

care to distinguish HELOCs from credit card plans when amending and implementing TILA and Regulation Z." Resp. Br. at 28.

First, PNC notes, Congress has passed legislation specifically targeted at HELOCs: "[I]n 1988, Congress passed two laws just weeks apart, the [Home Equity Loan Consumer Protection Act] and the [Fair Credit and Charge Card Disclosure Act], to address credit card and HELOC credit plans separately." Resp. Br. at 30. In doing so, "Congress did not amend the offset prohibition in § 1666h or enlarge the meaning of the term 'credit card plan' to include HELOCs in the FCCCDA." *Id.* at 6. The problem with this argument is that it assumes that Congress *had* to amend the offset prohibition in order to include HELOCs—in other words, that the offset prohibition excluded HELOCs in the first place. What's more, the fact that Congress passed other legislation addressing HELOCs is of no moment. "When there are two acts upon the same subject, the rule is to give effect to both if possible . . . It is not sufficient . . . to establish that subsequent laws cover some or even all of the cases provided for by (the prior act); for they may be merely affirmative, or cumulative, or auxiliary." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) (quotations omitted). "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

Second, PNC argues, the Federal Reserve Board has consistently explained that HELOCs are a separate kind of credit with unique features. It is true that the Board has recognized that open-end credit that isn't home-secured and open-end credit that is have distinct features. In 2004, for instance, when the Board began its process of reviewing

15

Regulation Z in its entirety, it did so in stages, focusing on open-end not home-secured accounts before moving on to open-end home-secured ones. 69 Fed. Reg. 70925, 70926 (Dec. 8, 2004). And in its January 2009 Rule, the Board noted that "many of the open-end rules have been reorganized to delineate clearly the requirements for HELOCs and other forms of open-end credit." 74 Fed. Reg. 5244, 5249 (Jan. 29, 2009). But this only gets PNC so far. PNC seems to think that because HELOCs are treated differently from not-home-secured credit card plans for *some* purposes, HELOCs must be treated differently from those plans for *every* purpose. And if that's the case, PNC says, the offset provision cannot apply to both HELOCs and not-home-secured credit card plans. In other words, "credit card plan" (which defines the offset provision's scope) can only include one of them.

PNC's syllogism fails at the first step. The fact that home-secured and not-home-secured lines of credit are treated differently for *some* purposes does not mean that they must be treated differently for *every* purpose. What is relevant to whether something is a "credit card plan" is not whether it is home-secured credit, but instead whether it involves a specific access device, *i.e.*, a credit card.

Finally, PNC argues, as a procedural matter, that this Court cannot consider the CFPB's arguments about TILA because Lyons made different arguments in his briefs. While Lyons' argument centers on the definition of "credit card" in the statute, the CFPB's argument relies on the statute's implementing regulations. Because "[a]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal," we ought to ignore the CFPB's argument, PNC says. Resp. Br. at 27 (quoting *United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001) (quotations

16

omitted)).  But this is a far cry from "splitting up issues."  Both Appellant and the CFPB make the same argument:  the offset provision applies to HELOCs because "credit card plan" includes HELOCs. The fact that Lyons bases his argument on the statute, while the CFPB focuses on the regulations implemented pursuant to the statute, does not bar us from considering the CFPB's argument.

We therefore hold that "credit card plan" includes HELOCs where credit is accessed via a credit card.  The offset provision covers the HELOC at issue and the district court's opinion is reversed and remanded as to Lyons' TILA claim.

## C. Real Estate Settlement Practices Act

Lyons also alleges that PNC violated RESPA by failing to "respond timely and adequately to his correspondence notifying it of an error in his mortgage servicing and requesting documentation and information."  J.A. 204.  Lyons says that his letter was a Qualified Written Request, which would mean that PNC had thirty business days to investigate and respond to Lyons.  *See* 12 C.F.R. § 1024.36(d)(1)–(2); 12 U.S.C. § 2605(e)(2).

The relevant provisions of RESPA apply to "federally related mortgage loan[s]."  12 U.S.C. § 2605(e)(1)(A).  Those are defined as "any loan" which, among other things, "is secured by a first or subordinate lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property."  12 U.S.C. § 2602(1)(A).  All parties agree that, on its face, this definition includes HELOCs.  But Congress also authorized the CFPB to "prescribe such rules and regulations, to make such interpretations,

17

and *to grant such reasonable exemptions for classes of transactions*, as may be necessary to achieve the purposes of this chapter." 12 U.S.C. § 2617(a) (emphasis added).

Pursuant to that regulation, the CFPB, via Regulation X (which implements RESPA), expressly excluded open-end lines of credit from the definition of "mortgage loan." 12 C.F.R. § 1024.31 ("Mortgage loan means any federally related mortgage loan, as that term is defined in § 1024.2 . . . but does not include open-end lines of credit (home equity plans)."). At the same time that the CFPB made that amendment to Regulation X, it amended Regulation Z. 78 Fed. Reg. 10696, 10843 (Feb. 14, 2013). The CFPB explained that "the protections proposed in subpart C of Regulation X" (which includes the timely and adequate response provision) "are not necessary for open-end lines of credit [*i.e.*, HELOCs]" because, as was clear from the newly amended Regulation Z, "separate error resolution and information request requirements exist under Regulation Z for open-end lines of credit." *Id.* at 10721–22. According to the regulations, "The Bureau believe[d] that it would contravene the consumer protection purposes of RESPA for servicers to expend resources complying with overlapping or unnecessary requirements that would not benefit consumers." *Id.* at 10722.

Appellant argues that the statute does not give the CFPB such expansive authority to exclude HELOCs from the definition of federally related mortgage loan. Opening Br. at 34. He acknowledges that Section 2617 gives the CFPB the authority to "grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter," but he says that Congress could not have intended for this "general provision" to override the "specific provision" of Section 2605(j)(3), *id.* at 37, which says that "[t]he

18

Bureau shall establish any requirements necessary to carry out this section." Putting aside whether Section 2605(j)(3) really is more specific than Section 2617, we do not believe these provisions contradict each other. Section 2605(j)(3) gives the CFPB the standard agency authority to carry out a statute via rulemaking. Section 2617 then gives the CFPB the additional power to exempt classes of transactions from its rules, even when the statute itself would otherwise apply, so long as those exemptions are reasonable.

We are not persuaded by the district court opinions that say the CFPB lacks this authority. *See Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 407–08 (E.D.N.Y. 2012); *Cortez v. Keystone Bank*, 2000 WL 536666, at **10–14 (E.D. Pa. May 2, 2000); *Hermann v. Wells Fargo Bank, N.A.*, 529 F. Supp. 3d 549, 558–59 (W.D. Va. 2021). None of those opinions even mentions that the statute gives the CFPB authority to create reasonable exemptions for classes of transactions, let alone analyzes how that provision interacts with the broader statutory definition of "federally related mortgage loan[]." For that reason, we do not find them instructive.

Finally, Lyons implies that Congress clearly did not intend for the CFPB to use its RESPA authority to "diminish the rights and protections enacted by Congress in the statute itself." Opening Br. at 37. We agree. But as the CFPB explained in the rulemaking process, TILA's Regulation Z already covered open-end lines of credit, like HELOCs, and some Regulation Z provisions, including billing error resolution procedures, "substantially overlap[ped]" with RESPA's regulations. 78 Fed. Reg. 10696, 10721–22. We are unconvinced that allowing the CFPB to exempt HELOCs from certain RESPA provisions contradicts the Dodd-Frank Congress's intent to enhance the rights and protections of

19

borrowers.[5]  We therefore hold that the CFPB has the authority to exempt HELOCs from "federally related mortgage loans," and we affirm the district court's judgment on Lyons' RESPA claim.

## IV.

The opinion of the district court is reversed as to Appellant's TILA claim and remanded for further proceedings.  The opinion of the district court is affirmed as to Appellant's RESPA claim.

*REVERSED AND REMANDED IN PART AND AFFIRMED IN PART*

---

[5] Whether the CFPB would have the authority to exempt HELOCs from the definition of "federally related mortgage loan" if another statute did not offer comparable protections for HELOCs is a question not presented here.

FLOYD, Senior Circuit Judge, dissenting in part:

Although I agree with much of the majority's reasoning, I would affirm the district court's judgment on both grounds. In my view, a home equity line of credit, or HELOC, is not a "credit card plan" under 15 U.S.C. § 1666h. That section of the Truth in Lending Act provides, "A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer," unless the cardholder gives advance authorization. 15 U.S.C. § 1666h(a). Thus, if an individual owes money on her credit card, the bank that issued the card cannot take money out of her checking account to offset the credit card debt. The majority's interpretation expands the term "credit card plan" in the offset provision to include any HELOC that can be accessed via a credit card. Because I believe Congress did not intend that result, I respectfully dissent.

The majority concludes that the offset provision applies to any type of credit—"secured, unsecured, home-secured, or secured by something other than a home"—so long as "a card is used to access the credit" and "terms and conditions govern the credit." *Ante*, at 10. According to the majority, the undefined term "credit card plan" means any "plan in which a consumer accesses credit using a credit card." *Ante*, at 10. That conclusion is overly formalistic and ignores the larger statutory and regulatory context of the Truth in Lending Act. It makes little sense that the applicability of the offset provision would hinge entirely on the method of access, namely, whether the borrower was issued a plastic card. A HELOC, after all, can be accessed via credit cards, special checks, or cash advances. JA 75. Under the majority's reasoning, a HELOC that came with a credit card is covered by

21

the offset provision, but a HELOC accessed by other means is not. The majority fails to explain why the former should receive the protection of the offset provision, but the latter should not. Although appealing for its textual simplicity and consumer-protection goals, this interpretation ignores the many instances in law, regulation, and colloquial usage that treat HELOCs and credit cards differently.

The district court relied on an unrelated part of Regulation Z—not the offset provision—which defines a "credit card account under an open-end (not home-secured) consumer credit plan" to exclude "a home equity plan . . . that is accessed by a credit card." 12 C.F.R. § 1026.2(a)(15)(ii). Both sides of this appeal seize on this definition as supporting their view. The CFPB for its part argues—and the majority agrees—that the offset provision was not similarly defined to exclude HELOCs, and it therefore should not be conflated with this separate, unrelated, HELOC-excluded "credit card account." On the other hand, PNC and amicus American Bankers Association argue that the term in § 1026.2(a)(15)(ii) merely reflects and codifies the longstanding treatment of HELOCs and credit cards as distinct entities.

In my view, the issue of whether a HELOC counts as a credit card plan under 15 U.S.C. § 1666h can be resolved without grappling with the reference to the unrelated "credit card account" term in 12 C.F.R. § 1026.2(a)(15)(ii). There are enough contextual clues to conclude that Congress did not intend "credit card plan" in § 1666h to mean any type of credit so long as it can be accessed via credit card.

As a starting point, HELOCs did not exist in 1974 when Congress created the offset provision. Congress first recognized the existence of HELOCs in 1980 as part of the Truth

22

in Lending Simplification and Reform Act. But that Act did not amend the offset provision in § 1666h, expand the meaning of the term "credit card plan" to include HELOCs, or otherwise address whether preexisting provisions of TILA applied to HELOCs. HELOCs did not become widely used consumer products until the mid-1980s. FRB Bulletin, *Home Equity Lines of Credit* 361 (June 1988), https://fraser.stlouisfed.org/files/docs/publications/FRB/1980s/frb_061988.pdf [https://perma.cc/5ZNB-T2KF].

The statutory scheme provides further evidence that "credit card plan" in § 1666h refers to an agreement governing a traditional credit card product—not to all forms of credit that can be accessed by credit card. The first five sections of the Fair Credit Billing Act apply generally to "open end credit plans." 15 U.S.C. §§ 1666–1666d. But the next five sections apply more specifically to credit cards, credit card plans, and credit card issuers. 15 U.S.C. §§ 1666e–1666i. The pivotal term "credit card plan" in § 1666h falls into this latter group. This statutory structure shows that Congress created a set of rules aimed broadly at open-end credit, which includes HELOCs, and another set of rules, such as the offset provision, for the credit card market in particular.

The legislative history, too, supports that "credit card plan" means exactly what common usage would suggest it means. The Senate Report accompanying the Truth in Lending Act amendments described the "typical" "credit card plan" as an arrangement between a merchant, card issuer, and card holder; the merchant and card issuer are sometimes one and the same. S. Rep. No. 93-278, at 8–9 (1973). This arrangement makes little sense if "credit card plan" includes HELOCs and all other lines of credit that come with a credit card.

23

Lawmakers and regulators have treated credit cards and HELOCs differently because they pose different risks for consumers. HELOCs use the borrower's home as security, which means failure to pay can result in foreclosure. Credit cards, on the other hand, are not secured as such. In 1988, Congress enacted a law that enshrined consumer protections based on the distinct nature and risks associated with HELOCs. That law, the Home Equity Loan Consumer Protection Act ("HELCPA"), did not address the offset provision or revise the definition of "credit card plan" to include HELOCs. Pub. L. No. 100-709, 102 Stat. 4725. Also in 1988, Congress passed a different law that focused on amending consumer protections for credit card plans. That law, the Fair Credit and Charge Card Disclosure Act ("FCCCDA"), did not address HELOCs. Pub. L. No. 100-583, 102 Stat. 2960. In 1989, when the Federal Reserve Board addressed regulations related to the two new laws, it drew distinctions between the two consumer credit products. The Board noted that "home equity lines of credit that may be accessed by the use of a credit or charge card and are subject to [HELCPA] are not subject to" the new requirements in the FCCCDA.[1] 54 Fed. Reg. at 13,856.

Regulators continued distinguishing between HELOCs and credit cards over the years. In 2004, noting that Regulation Z had "not been reviewed in its entirety" since the enactment of the TILA Simplification Act, the Federal Reserve Board announced its plan

---

[1] Similarly, a few months later, the Board amended Regulation Z to implement HELCPA and stated that a provision "dealing with credit and charge card applications and solicitations [] does not apply to home equity plans accessible by a credit or charge card." Truth in Lending, Home Equity Disclosure and Substantive Rules, 54 Fed. Reg. 24,670, 24,672 (June 9, 1989).

24

to review the entire regulation in stages. The Board said it would "focus the first stage of the review on Regulation Z's rules for open-end (revolving) credit accounts that are not home-secured, chiefly general-purpose credit cards and merchant-specific credit plans, although the rules apply to open-end lines generally." Truth in Lending, 69 Fed. Reg. 70,925, 70,926 (Dec. 8, 2004). Upon completing its review of "open-end (not home-secured) credit" provisions, the Board explained that "many of the open-end rules have been reorganized to delineate clearly the requirements for HELOCs and other forms of open-end credit." Truth in Lending, 74 Fed. Reg. 5,244, 5,249 (Jan. 29, 2009). This delineation was necessary because "HELOCs and closed-end credit are largely separate product lines from credit card and other open-end (not home-secured) plans." 74 Fed. Reg. at 5,267.

The CFPB has not pointed to any regulation, ruling, or administrative practice in which it (or the Federal Reserve Board before it) has advised that "credit card plan" in the offset provision includes HELOCs. Indeed, up until this appeal, the CFPB had followed the lead of the Board and drawn clear distinctions between credit cards and HELOCs. In a recent publication for consumers explaining "what you should know about" HELOCs, the CFPB summarized how HELOCs differ from "other money sources," including credit cards. Consumer Financial Protection Bureau, *What You Should Know About Home Equity Lines of Credit (HELOC): Borrowing from the Value of Your Home* 2–5 (2022), https://files.consumerfinance.gov/f/documents/cfpb_heloc-brochure_print.pdf

25

[https://perma.cc/NF77-9WUQ].[2]  Whereas a HELOC puts "your home at risk," a credit card does not.  *Id.* at 3, 5.  For that reason, a credit card often comes with a "[h]igher interest rate than a loan that uses your home as collateral."  *Id.* at 5.  The CFPB highlighted other differences between HELOCs and credit cards, including how banks determine the amount consumers can borrow.  For HELOCs, the credit amount is "[g]enerally a percentage of the appraised value of your home, minus the amount you owe on your mortgage," whereas for credit cards, it is "[u]p to the amount of your credit limit, as determined by the credit card company."  *Id.* at 2, 4.

The CFPB is required to conduct reviews of "credit card plans" but has never understood that statutory mandate to encompass HELOCs.  The CARD Act, discussed by the majority, requires the CFPB to conduct a review every two years of "the effectiveness of disclosure of terms, fees, and other expenses of *credit card plans*."  15 U.S.C. § 1616(a)(2) (emphasis added).  If the term "credit card plan" in § 1666h meant any type of credit accessed via credit card, such as HELOCs, then those biennial reports would surely review the disclosure terms associated with HELOCs.  But those reports—in 2013, 2015, 2017, 2019, 2021, and 2023—have never described HELOCs as credit card plans or analyzed them in depth.  The few references in passing to HELOCs were used as points of contrast with credit cards.  *See, e.g.*, Consumer Financial Protection Bureau, *CARD Act Report* 6 (2013), https://files.consumerfinance.gov/f/201309_cfpb_card-act-report.pdf

---

[2] By law, lenders must provide this very pamphlet (or one with "substantially similar information") to customers before they take out a HELOC.  15 U.S.C. § 1637a(e).

26

[https://perma.cc/54EE-3HZ9]. That report recognized the reality that the markets for credit cards and HELOCs are different: "The post-2009 recovery in the credit card market has been more robust than that of some markets (such as home equity lines of credit), while lagging behind that of others (such as auto lending)." *Id.*

The majority acknowledges the many distinctions between credit cards and HELOCs but observes: "The fact that home-secured and not-home-secured lines of credit are treated differently for *some* purposes does not mean that they must be treated differently for *every* purpose." *Ante*, at 16. I agree with that statement as a general maxim. But we disagree at the next step—how to treat home-secured lines of credit for *this* purpose, the offset provision. The majority concludes the offset provision covers any credit plan that "involves a specific access device, *i.e.*, a credit card." *Ante*, at 16. This approach prioritizes form (whether the credit is accessed via credit card device) over function (the substance of the credit arrangement and whether it makes sense that it should receive the benefits of offset protection).

There are good reasons to think Congress wanted the offset provision to apply to traditional, unsecured credit card plans but not to HELOCs. In the realm of conventional credit card plans, for example, consumers might intend money held in deposit accounts to be used to pay off a mortgage or car payment to avoid foreclosure of their home or repossession of their car. But without the offset protection, their credit card issuer could take those deposited funds and apply them to cover incidental expenses charged to a credit card. If a bank could unilaterally offset a person's credit card debt by taking funds out of

27

the customer's checking account, the bank would effectively be converting the unsecured debt to a secured one.

It makes less sense to apply the offset prohibition to secured credit products like HELOCs. The amicus brief by the American Bankers Association warns that applying the prohibition to HELOCs could actually harm consumers by increasing the risk of foreclosure, since offsetting HELOC debt with deposit funds provides a backstop before a bank resorts to foreclosure. "A lender is less likely to undertake the costly and time-consuming process of home foreclosure when it could obtain the funds it is owed through the simpler offset process of transferring funds from a deposit account to the HELOC." Bankers Br. 25. In addition, there are a number of consumer protections that already uniquely apply to HELOCs and the risks they pose. For instance, lenders cannot unilaterally terminate a HELOC account and require immediate payment. 15 U.S.C. § 1647(b). There are also limits on lenders' ability to change the terms and interest rates for HELOCs. *Id.* § 1647(a) & (b).

The majority interprets "credit card plan" in the offset provision to encompass any type of credit—"secured, unsecured, home-secured, or secured by something other than a home"—so long as "it involves a specific access device, *i.e.*, a credit card." *Ante*, at 10, 16. In my view, the statutory structure and regulatory history do not support such an expansive definition. I therefore respectfully dissent from that portion of the majority opinion.

28